William T. Reynolds, IV (*seeking admission phv*)
**THE LAW OFFICES OF CHICAGO-KENT**
    **COLLEGE OF LAW**
565 West Adams Street, Suite 600
Chicago, IL 60661
Telephone (312) 906-5038
Facsimile (773) 696-2314
wreynold@illinoistech.edu

Richard L. Frankel
**BROSS & FRANKEL, P.A.**
725 Kenilworth Ave, Suite 2
Cherry Hill, NJ 08002
Telephone (856) 795-8880
Facsimile (856) 234-4848
*Attorneys for Plaintiff*


## IN THE UNITED STATES DISTRICT COURT
## OF NEW JERSEY

| | |
|---|---|
| KA'LIAL GLAUD,<br><br>                Plaintiff,<br><br>      v.<br><br>THE NFL PLAYER DISABILITY<br>AND SURVIVOR BENEFIT<br>PLAN; WILLIAM SIMON<br>GARMOE, MA, Ph.D.; and<br>SILVANA RIGGIO, M.D.<br><br>                Defendants. | No. |


## COMPLAINT

Now comes the Plaintiff, KA'LIAL GLAUD, by his attorneys, and complaining against the Defendants, THE NFL PLAYER DISABILITY AND SURVIVOR BENEFIT PLAN, WILLIAM SIMON GARMOE, MA, Ph.D., and SILVANA RIGGIO, M.D., he states:

### Jurisdiction and Venue

1.      Jurisdiction of the court is based upon the Employee Retirement Income Security Act of 1974 ("ERISA"); and in particular, 29 U.S.C. §§ 1132(e)(1) and 1132(f). Those provisions give the district court jurisdiction to hear civil actions brought to recover benefits due under the terms of employee welfare benefit plans, which, in this case, consists of Neurocognitive Disability benefits under The NFL Player Disability and Survivor Benefit Plan.

2.      This action may additionally be brought before this court pursuant to 28 U.S.C. § 1331, which gives the district court jurisdiction over actions that arise under the laws of the United States.

3.      The ERISA statute provides, at 29 U.S.C. § 1133, a mechanism for administrative or internal appeal of benefit denials consistent with the language of the governing Plan documents. Those avenues of appeal have been exhausted.

4.      Venue is proper in the District of New Jersey pursuant to ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) because Plaintiff resides within this District.

5.       Venue is also proper in the District of New Jersey pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred within this district.

### The Parties

2

6.      The plaintiff, Ka'lial Glaud ("Glaud" or "Plaintiff"), age 34 (born in 1990), is a legal resident of New Jersey and resides in Sicklerville, Camden County, New Jersey.

7.      The defendant, The NFL Player Disability and Survivor Benefit Plan ("the Plan") was at all times relevant operating throughout the United States and within the District of New Jersey, and it delivered coverage to Plaintiff in the State of New Jersey.

8.      The defendant, William Simon Garmoe, MA, Ph.D. ("Dr. Garmoe"), was at all relevant times retained by the Plan as a non-employee ERISA fiduciary with discretionary authority to make factual determinations regarding Glaud's eligibility for benefits. Upon information and belief, Dr. Garmoe is a citizen of the State of Maryland.

9.      The defendant, Silvana Riggio, M.D., ("Dr. Riggio"), was at all relevant times retained by the Plan as a non-employee ERISA fiduciary with discretionary authority to make factual determinations regarding Glaud's eligibility for benefits. Upon information and belief, Dr. Riggio is a citizen of the State of New York.

10.     The Plan, Dr. Garmoe, and Dr. Riggio are all co-fiduciaries pursuant to ERISA § 405(a) (29 U.S.C. § 1105(a)).

## Nature of the Action

11.     This is a claim seeking payment of benefits claimed to be due under the Plan and the removal of two fiduciaries.

12.     Count I of this action is brought against the Plan pursuant to ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)).

13.     Counts II and III of this action are brought against individual fiduciaries pursuant to ERISA § 502(a)(2) (29 U.S.C. § 1132(a)(2)).

14.     Plaintiff also seeks attorney's fees pursuant to ERISA § 502(g) (29 U.S.C. § 1132(g)).

**The Plan and its Relevant Provisions**

15.     The Plan is a multi-employer plan as defined in ERISA § 3(37) (29 U.S.C. § 1002(37)).

16.     The Plan is maintained under Collective Bargaining Agreements between the National Football League Players Association ("NFLPA" or "Union") and the NFL Management Council ("NFLMC").

17.     The Plan provides disability and related benefits to eligible NFL players, including the Plaintiff.

18.     The Plan designates the Disability Board, a "joint Board of Trustees", as its plan administrator and trustee.

19.     The Disability Board has six voting members, three of whom are selected by the NFLPA and three of whom are selected by the NFLMC. The Commissioner of the NFL is a nonvoting member and the chairman of the Disability Board.

20.     The Disability Board is the Plan's named fiduciary as defined in ERISA § 402(a)(2) (29 U.S.C. § 1102(a)(2)).

21.     An eligible Player (as defined in the Plan) who otherwise satisfies the eligibility terms of the Plan can receive disability benefits under one of three categories: (1) Total and Permanent (T&P) Disability benefits (Plan. Art. 3 § 3.1 and Plan Art. 4 § 4.1); (2) Line of Duty Disability benefits ("LOD Benefits") (Plan. Art. 5 § 5.1); or, as

relevant in this case, (3) Neurocognitive Disability benefits ("NC Benefits") (Plan Art. 6. §

6.1).

22.     At the time a Player makes a claim for benefits to the Plan, the application

is received by the NFL Player Benefits Office ("the Benefits Office").

23.     The Benefits Office, located in Baltimore, Maryland, is responsible for

handling the day-to-day administration of the Plan.

24.     As part of its administrative and ministerial responsibilities, the Benefits

Office assigns a coordinator to each application for Plan benefits at the time it is

received.

25.     As part of its administrative and ministerial responsibilities, the Benefits

Office schedules Player appointments with Plan physicians and uploads medical records

to a shared "portal," making the documents visible to the Plan's Disability Initial Claims

Committee ("the DICC") and Board members.

26.     The DICC is responsible for reviewing a Player's medical records,

interpreting the Plan, and making an initial determination regarding whether a Player

qualifies for benefits.

27.     The DICC has three members. The NFL Management Council (NFLMC)

appoints one member, and the NFL Players Association (NFLPA) appoints another. The

third member is the Medical Director, an appointed physician who advises the Plan. The

NFLMC and NFLPA select the Medical Director by mutual agreement.

28.     When the DICC votes on an application for disability benefits, the two

non-medical members (those appointed by the NFLMC and NFLPA) cast the first votes. If

5

the non-medical members are "deadlocked," the Plan calls for the Medical Director to break the tie and decide the claim. If, however, the Medical Director determines that the medical evidence is either inconclusive or insufficient, he or she will abstain from voting and the resulting deadlock will be treated as a deemed denial of the claim.

29.     When the DICC denies a claim for disability benefits, a Player has 180 days from the date he receives notice to appeal the initial decision.

30.     All appeals of DICC decisions are made to the Disability Board.

31.     In making its decision on review, the Plan requires the Disability Board to consider all available information, regardless of whether it was available or presented to the DICC.

32.     In reviewing disability claims, the Disability Board is not permitted to afford any deference or consideration to the initial determination of the DICC.

33.     The Disability Board makes its decisions on Player appeals at its scheduled quarterly meetings and notifies Players of their decisions in subsequent written decisions. No formal discussion of individual cases typically occurs at the scheduled quarterly meeting.

34.     Two days of informal meetings generally occur before the Disability Board members meet.

35.     On the first day of informal meetings, Disability Board advisors, staff from the Benefits Office, and attorneys from Groom Law Group, the Plan's primary attorneys, all meet to review disability cases.

6

36.    On the second day of informal meetings, members of the Disability Board informally discuss cases with attorneys from Groom Law Group.

37.    Disability Board members do not review all of the documents in each individual application for benefits, and Disability Board advisors have not been directed to complete a comprehensive review of each file. As a result, Disability Board members do not actually know what information their advisors have reviewed.

38.    The Disability Board decides blocks of 50 or more cases at each quarterly meeting.

*The Role of Neutral Physicians and Medical Advisory Physicians*
*During the Claim Appeal Process*

39.    The Plan retains Neutral Physicians to review medical records and write reports to inform the decision of the DICC or Disability Board.

40.    Neutral Physicians may, at the request of the DICC or Disability Board, also examine Players who apply for disability benefits. Either the DICC or the Board can order a player to attend an examination with a Neutral Physician.

41.    Upon retaining a Neutral Physician, the Plan provides each Neutral Physician with an Orientation Manual related to the Neutral Physician's area of medical specialty.

42.    Neutral Physicians must strictly comply with the terms of the Orientation Manuel, including its standardized testing protocol and the format of its forms and reports.

43.    As part of its administrative and ministerial responsibilities, the Benefits Office serves as the liaison between the Plan and Neutral Physicians, with

responsibilities including selecting Neutral Physicians, facilitating the transfer of medical records, scheduling Player examinations, and otherwise communicating with the Neutral Physicians.

44.     There are no formal criteria under which the Benefits Office identifies doctors to serve as Neutral Physicians.

45.     Once a Neutral Physician is appointed by the Benefits Office, there is no formal process or procedure for the NFLPA to petition to remove that physician from the role.

46.     All Neutral Physicians are directly paid by the Plan.

47.     Once a Player is examined by a Neural Physician, the DICC relies heavily on reports from the examining Neutral Physicians in deciding that Player's eligibility for benefits under the Plan.

48.     Medical Advisory Physicians ("MAP") are specialist physicians retained by the Plan to evaluate medical aspects of certain disability applications.

49.     When three or more Disability Board members conclude that a specific medical issue exists as to whether a Player qualifies for disability benefits, the issue can be submitted to a MAP for a final and binding determination regarding such medical issues.

50.     Upon review of the evidence provided by the Benefits Office, the Plan directs the MAP to make a final and binding determination with respect to a medical decision as to whether the Player qualifies for disability benefits.

51.     All MAPs are directly paid by the Plan.

8

*Additional Plan Provisions Relevant to Plaintiff's Claim*

52.     Under Section 6.1 of the Plan, a Player must meet certain requirements to be eligible for NC Benefits. For applications received after April 1, 2020, the requirements in 6.1(c)-(m) must be satisfied:

> "(c) The Player must not receive monthly retirement benefits under Articles 4 or 4A of the Bert Bell/Pete Rozelle Plan or be a Pension Expansion Player within the meaning of the Bert Bell/Pete Rozelle Plan.
>
> (d) The Player must not be receiving T&P benefits under this Plan or the Bert Bell/Pete Rozelle Plan.
>
> (e) At least one Plan Neutral Physician must find that the Player has a mild or moderate neurocognitive impairment in accordance with Section 6.2. If no Plan Neutral Physician renders such a conclusion, then this threshold requirement is not satisfied, and the Player will not be eligible for and will not receive NC Benefits, regardless of any other fact(s), statement(s), or determination(s), by any other person or entity, contained in the administrative record.
>
> (f) After reviewing the report(s) of the Plan Neutral Physician(s), along with all other facts and circumstances in the administrative record, the Disability Initial Claims Committee or the Disability Board, as the case may be, must conclude, in its absolute discretion, that the Player has a mild or moderate neurocognitive impairment in accordance with Section 6.2.
>
> (g) The Player must execute the release described in Section 6.3.
>
> (h) The Player must not have a pending application for T&P benefits or for line-of-duty disability benefits under this Plan or the Bert Bell/Pete Rozelle Plan, except that a Player can file a claim for the NC Benefit simultaneously with either or both of those benefits.
>
> (i) The Player must satisfy the other requirements of this Article 6.
>
> (j) The Player must not have previously received the NC Benefit and had those benefits terminate at age 55 before April 1, 2020 by virtue of earlier versions of this Plan.
>
> (k) If the Player is not a Vested Inactive Player, his application for the NC Benefit must be received by the Plan within eighty-four (84) months after he ceased to be an Active Player.

(l) The Player must be under age 65.

(m) For applications received on and after October 1, 2020, the Player must submit Medical Records with his initial application or appeal, as the case may be, subject to the rules of Section 6.2(d). This paragraph (m) does not apply to applications received prior to October 1, 2020."

53.      The Plan recognizes two types of neurocognitive impairment: mild

impairment and moderate impairment. Section 6.2(a) defines mild impairment as follows:

"A Player eligible for benefits under this Article 6 will be deemed to have a mild neurocognitive impairment if he has a mild objective impairment in one or more domains of neurocognitive functioning which reflect acquired brain dysfunction, but not severe enough to interfere with his ability to independently perform complex activities of daily living or to engage in any occupation for remuneration or profit."

Section 6.2(b) defines moderate impairment as follows:

"A Player eligible for benefits under this Article 6 will be deemed to have a moderate neurocognitive impairment if he has a mild-moderate objective impairment in two or more domains of neurocognitive functioning which reflect acquired brain dysfunction and which may require use of compensatory strategies and/or accommodations in order to independently perform complex activities of daily living or to engage in any occupation for remuneration or profit."

54.      In addition, a Player applying for NC Benefits must also meet the validity

testing requirements outlined in Section 6.2(e):

"A Player who is otherwise eligible for benefits under this Article 6 and who is referred for neuropsychological testing will undergo, among other testing, two validity tests. A Player who fails both validity tests will not be eligible for the NC Benefit. A Player who fails one validity test may be eligible for the NC Benefit, but only if the neuropsychologist provides an explanation satisfactory to the Disability Board or the Disability Initial Claims Committee (as applicable) for why the Player should receive the NC Benefit despite the failed validity test."

55.      The Plan further states:

The Disability Board has absolute discretion and authority to interpret the Disability Plan, review claims for benefits, and decide how the Disability Plan applies in different situations.

56.     The Plan further states:

The Disability Initial Claims Committee has absolute discretion and authority to interpret the Disability Plan and to make factual determinations when it makes disability benefit determinations.

57.     The Plan further states:

Three or more members of the Disability Board may require the Medical Advisory Physician to make a final and binding determination with respect to a medical decision as to whether you qualify for disability benefits. Any such designated [MAP] physician will have full and absolute discretion, authority and power to decide such medical issues. In all other respects, including the interpretation of the Disability Plan and the decision as to whether the claimant is entitled to benefits, the Disability Board will retain its full and absolute discretion.

58.     Each benefit claim denied by the Disability Board provides a direct

monetary benefit to each member club of the NFL

## Factual Allegations

59.     Glaud began playing football as an adolescent, primarily playing linebacker

through high school and college. He had a successful high school career at Winslow

Township High School in New Jersey, without any documented history of concussions.

60.     After graduating high school, Glaud enrolled at Rutgers University in New

Jersey, where he played linebacker for four years.

61.     While playing at Rutgers University, Glaud sustained two documented

concussions in 2010 and 2011, both from specific head impacts.

62.     In 2013, Glaud signed with the Tampa Bay Buccaneers as an undrafted free

agent.

63.     Glaud was continuously employed by the Tampa Bay Buccaneers from 2013 through 2015.

64.     In 2015, Glaud was signed by the Dallas Cowboys as a free agent and was active for all four 2015 preseason games.

65.     On September 3, 2015, Glaud suffered a concussion while playing for the Dallas Cowboys. He does not remember the injury or several hours of time after the concussion occurred.

66.     Following his concussion, Glaud experienced headaches, disorientation, confusion, and short-term memory impairment.

67.     Approximately two weeks after the injury, Glaud saw neurologist Alan W. Martin, M.D., who diagnosed him with concussion and disequilibrium.

68.     Glaud spent the entire 2015 NFL season on injured reserve due to his concussion.

69.     While on injured reserve, Glaud attended a two-month comprehensive neurological rehabilitation program at the Centre for Neuro Skills with the goals of decreasing motion sensitivity, increasing postural control and balance, improving divided and sustained attention, relieving headache pain, and reducing dizziness all to return to NFL football play. He fully participated in the program but experienced only modest improvement.

70.     Glaud was released by the Dallas Cowboys prior to the 2016 season because of a failed physical attributed to his September 2015 concussion and related long-term symptoms.

71.     From January 2016 through February 2020, Glaud received primary medical treatment from sports medicine doctor Arlene Goodman, M.D. and several other specialists for headaches, balance problems, convergence insufficiency, saccadic eye movement deficits, and vertigo.

72.     From February 2019 through August 2022, Glaud attended The Turning Point: Cognitive and Educational Solutions for cognitive rehabilitation treatment, including cognitive therapy, biofeedback, and neuroplasticity training.

73.     Despite consistent neurological treatment since his September 2015 concussion, Glaud has not been able to return to full-time gainful employment in any capacity since his release from the Dallas Cowboys in 2016 due to unresolved post-concussion symptoms.

### History of Glaud's Line of Duty Disability Claim and Claims for Similar Non-Plan Benefits

74.     In May 2018, Glaud applied for Line-Of-Duty Disability ("LOD") benefits under the Plan.

75.     Upon receipt of his application for LOD benefits, the Plan compelled Glaud to attend two in-person examinations with physicians of its choice.

76.     On June 19, 2018, Glaud was examined by John Douglas Mann, M.D. at the Carolina Headache Institute in connection with his application for LOD benefits.

77.     Following his examination, Dr. Mann reported that Glaud suffered from photophobia and sonophobia, poor concentration, mood swings, insomnia, and chronic fatigue. Dr. Mann further opined that it was likely that Glaud suffered from extended post-concussive syndrome.

78.     On June 25, 2018, Glaud was examined by David J. Libon, Ph.D. in connection with his application for LOD benefits.

79.     Following his examination, Dr. Libon opined that Glaud suffered from significant concussion and traumatic brain injury resulting in persistent and debilitating headaches.

80.     In July 2018, Glaud was approved by the Plan for LOD benefits, effective March 1, 2018.

81.     Around the time he applied for LOD benefits, Glaud also applied for benefits through the State of New Jersey Department of Human Services Traumatic Brain Injury Fund ("the TBI Fund").

82.     The TBI Fund provides home medication, service coordination, assistive technology, and medical treatment and prescription drug coverage for covered individuals who have sustained an injury to the brain caused by a blow or jolt to the head or a penetrating head injury/neuro-trauma that disrupts the normal brain function, where continued impairment can be demonstrated.

83.     In March 2019, the New Jersey Division of Disability Services approved Glaud's claim for benefits under the TBI Fund.

84.      Also around the time he applied for LOD benefits, Glaud applied for private life insurance with New York Life.

**85.**     In April 2019, New York Life denied Glaud's application for life insurance, citing his chronic post-traumatic headaches, persistent postural-perceptual dizziness,

14

history of concussions, and other medical history in determining that he was

uninsurable.

**History of Glaud's Claim for
Neurocognitive Disability Benefits Under the Plan**

86.    On March 1, 2023, Glaud applied to the Plan for NC Benefits.

87.    Upon receipt of Glaud's completed application for NC Benefits, the DICC

compelled Glaud to attend a neurological evaluation with Nicholas Streicher, M.D., and a

neuropsychological examination with Katie A. Lehockey, PhD.

88.    Both Dr. Lehockey and Dr. Streicher examined and evaluated Glaud in

Washington, D.C., requiring Glaud to travel from his home in New Jersey for the

appointments.

89.    On March 28, 2023, Glaud was evaluated by Dr. Streicher. The appointment

lasted sixty minutes, and Dr. Streicher reports that he additionally reviewed 526 pages of

Glaud's medical records.

**90.**    In his April 9, 2023 report, Dr. Streicher wrote,

> Overall, it is my impression that Mr. Glaud has cognitive concerns
> that has [sic] been present over approximately the past 8 years. His
> MOCA score of 18/30 supports this, although his difficulties could be
> contributed to decreased attention and/or mood. Additionally, his
> difficulties appear to be related to undertreated migraines. He has an
> otherwise unremarkable neurologic exam. He can perform
> instrumental and basic ADLs, although he does have assistance from
> his significant other.

91.    On March 29, 2023, Glaud underwent a neuropsychological evaluation

performed by Dr. Lehockey. Dr. Lehockey reports that she additionally reviewed Glaud's

disability application paperwork and 526 pages of Glaud's medical records.

92.     As part of Glaud's examination, Dr. Lehockey administered a series of standardized neuropsychological tests to Glaud, including the Test of Premorbid Functioning (TOPF); select subtests of the Wechsler Adult Intelligence Scale-4th edition (WAIS IV); the Trail Making, Verbal Fluency, and Color-Word subtests of the Delis-Kaplan Executive Function System (D-KEFS); the California Verbal Learning Test-2nd edition (CVLT-II); select subtests of the Wechsler Memory Scale- 4th edition (WMS-IV); the Rey-Osterrieth Figure Copy; and the Minnesota Multiphasic Personality Inventory-2 Restructured Form (MMPI-2RF). Two additional tests were noted as not administered due to time limitations.

93.     As part of Glaud's examination, Dr. Lehockey also administered two stand-alone symptom validity tests: the Test of Memory Malingering (TOMM), which contains three subtests, and the Medical Symptom Validity Test (MSVT), which contains five subtests.

94.     The TOMM is a forced-choice recognition test consisting of two learning trials and a delayed retention trial. The learning trials consist of a study phase and a test phase, presenting and testing memory related to 50 line-drawn pictures each presented for three seconds. The delated retention phase is administered after a 10-to-15-minute delay and consists only of the test phase. The TOMM is designed for adults to discriminate between true memory-impaired patients and malingerers[1].

95.     The MSVT is a short, computerized verbal memory screening test with multiple subtests measuring memory and response consistency, in which ten-word pairs

[1] Rees, Laura M., Tom N. Tombaugh, and Luc Boulay. "Depression and the test of memory malingering." *Archives of Clinical Neuropsychology* 16.5 (2001): 501-506.

representing common objects that are easy to imagine (e.g., French-Fries) are presented over two trials. Following presentation, Immediate Recognition memory (IR) is tested. After a 10-minute delay, Delayed Recognition memory (DR) is tested, followed by a Paired-Associates trial (PA) where the first word of each pair is presented and the ability to recall the second word is assessed. Finally, there is a Free Recall trial (FR). In addition to memory performance, a consistency variable (CNS) is calculated to reflect recall consistency across tasks[2].

96.    In addition to the TOMM and MSVT stand-alone symptom validity tests, the MMPI-2RF also contains embedded questions designed to test symptom validity. Dr. Lehockey also administered those embedded validity questions to Glaud.

97.    Following her examination of Glaud, Dr. Lehockey prepared and submitted a report to the Plan titled "NFL Neurocognitive Disability Benefit Neuropsychology Report Form". The report is undated but appears to have been submitted to the Plan on or about April 11, 2023.

98.    In her report, Dr. Lehockey wrote that Glaud " [a]t times requested repetition of test instructions due to distraction from his experiences of headache pain and indigestion"; that he "appeared to become more symptomatic when presented with visually-mediated and timed tasks, which may have distracted him"; and that "fatigue appeared to start to affect his ability to persevere as the afternoon testing session continued."

---

[2] Laura L.S. Howe, Ashton M. Anderson, David A.S. Kaufman, Bonnie C. Sachs, David W. Loring. "Characterization of the Medical Symptom Validity Test in evaluation of clinically referred memory disorders clinic patients." *Archives of Clinical Neuropsychology,* Volume 22, Issue 6 (2007): 753-761.

99.     Included with Dr. Lehockey's report was a document titled "NFL Disability Program Neuro-Cognitive Battery" ("the Battery Report") that reported Glaud's "demographic adjusted" test scores on each administered test and a description of that test result.

100.    Dr. Lehockey's Battery Report shows that Glaud scored "below average" on the WAIS-IV's composite Working Memory tests and "exceptionally low" on the WAIS-IV's composite Processing Speed tests.

101.    The Battery Report shows that Glaud scored "exceptionally low" on five aspects of the D-KEFS, and "below average" or "low average" on three other aspects of the D-KEFS on tests designed to evaluate executive function.

102.    The Battery Report shows that Glaud scored "below average" on the D-KEFS on a test designed to evaluate motor skill.

103.    The Battery Report shows that Glaud scored "exceptionally low" on three aspects of the CVLT-II, and "below average" or "low average" on six other aspects of the CVLT-II on tests designed to evaluate verbal learning and recent memory.

104.     The Battery Report shows that Glaud scored "below average" on two aspects of the WMS-IV on tests designed to evaluate verbal learning and recent memory.

105.    The Battery Report shows that Glaud scored "below/low average" on the Rey-Osterrieth Figure Copy, a test designed to evaluate spatial-perceptual skills.

106.    The Battery Report shows that Glaud passed the TOMM test, a stand-alone validity test measure, with a "valid range" score of 47.

107.     The Battery Report shows that Glaud passed the CVLT-II Forced Choice Recognition test, an embedded validity test measure, with a "valid range" score of 16.

108.     The Battery Report shows that Glaud passed the MSVT-IR and MSVT-DR, two stand-alone validity test measures, with "valid scores" of 95% and 90%.

109.     The Battery Report shows that Glaud scored an 85% on the MSVT-CNS, a stand-alone validity test measure, which is considered an "invalid score."

110.     The MSVT test administration manual designates a score of 85% on the MSVT-CNS as the "cut-off" score for validity, with scores of 85% or below considered a test failure.

111.      In her report to the Plan, Dr. Lehockey wrote,

Test scores from the neuropsychological evaluation are provided in the data table attached to this report. Results on a stand-alone measure of performance validity was suboptimal, resulting in unreliable and invalid cognitive test performance. Thus, his results on cognitive testing are not discussed here. . . .

Results of the present assessment were not judged to be a valid, reliable representation of the Player's current cognitive functioning based on suboptimal performance on one stand-alone performance validity measure. Thus, the current evaluation of his cognitive functioning cannot be reliably used to assess for the presence of objective cognitive impairment.

112.     Dr. Lehockey does not cite, reference, or refer to any other examples, inconsistencies, or medical opinions in Glaud's medical history that would support her claim that Glaud exaggerated or feigned his symptoms in any way.

113.     Contrary to the testing protocols established in the MSVT test administration manual, Dr. Lehockey did not consider Glaud's failure of the MSVT-CNS in the context of any of the other information available to her in the medical records.

114.    Contrary to the testing protocols established in the MSVT test administration manual, Dr. Lehockey did not consider the impact of Glaud's pain, fatigue, depression, or cogniphobia[3] as possible mitigating explanation for Glaud's failure of the MSVT-CNS.

115.    After her examination, Dr. Lehockey shared with Dr. Streicher that Glaud failed the MSVT-CNS, leading Dr. Streicher to add the following statement to his Impression and Discussion:

> [Glaud's] neuropsychological testing was invalid, so it is difficult to comment on an underlying neuropsychological disorder. Overall, before a true assessment of cognitive function can be made, migraines need to be better managed as well as any other residual concussion-like symptoms, his mood issues need to be addressed, and his validity measures on testing need to be met.

116.    On April 13, 2023, the DICC denied Glaud's application for NC Benefits in a written decision letter.

**117.**    Upon information and belief, the DICC's decision letter was written by attorneys or paralegals for Groom Law Group.

### History of Glaud's Appeal of the Plan's
### Denial of Neurocognitive Disability Benefits

118.    In August 2023, the law firm of Bross & Frankel submitted notice to the Plan that Glaud authorized it and attorney Richard Frankel to serve as his representative.

119.    On September 25, 2023, Bross & Frankel requested an extension of time to file a claim appeal on Glaud's behalf to allow time for Glaud to undergo additional

---

[3] Cogniphobia is a condition where individuals with headaches engage in unconscious fearful avoidance of mental exertion because of the fear of triggering a headache. Such behavior is known to lead to decreased cognitive effort, potentially resulting in the inadvertent failure of performance validity test measures.

independent evaluation of his ongoing medical condition. The Plan granted this request for an extension.

120.     On October 25, 2023, Glaud was examined by independent neuropsychologist Robert Rider, Ph.D. Dr. Rider reports that he additionally reviewed Glaud's treatment records and Dr. Lehockey's neuropsychological report with underlying raw data.

121.     As part of Glaud's examination, Dr. Rider administered a series of standardized neuropsychological tests to Glaud, including the Boston Naming Test, the Controlled Oral Word Association Test (COWAT), the Rey 15-Item Visual Memory Test (Rey-15), the Ruf 2 & 7 Selective Attention Test, the Trail Making Tests, Parts A & B (TMT-A and TMT-B), select subtests of the Wechsler Adult Intelligence Scale-4th edition (WAIS IV); select subtests of the Wide Range Assessment of Memory and Learning, 2nd Edition  (WRAML2), and the Wisconsin Card Sorting Test (WCST).

122.     As part of Glaud's examination, Dr. Rider also administered three stand-alone symptom validity tests – the Test of Memory Malingering (TOMM), the Medical Symptom Validity Test (MSVT), and the Dot Counting Test (DCT).

123.     Following his examination of Glaud, Dr. Rider prepared and submitted a report of his findings and conclusions to Richard Frankel. As part of his report, Dr. Rider incorporated findings from Glaud's two prior neuropsychological examinations, including the underlying raw test data from Dr. Lehockey's March 23, 2023 examination.

**124.**     In his report, Dr. Rider wrote,

> [Mr. Glaud] had no reported difficulties with cognitive functioning before his 2015 concussion and has been consistent with and participatory in

21

cognitive rehabilitation and other therapies since. Despite his implementation of therapeutic skills in his daily life, Mr. Glaud has continued to have moderate to significant cognitive difficulties based on reports by his treating providers. On the current evaluation, those difficulties were evident in the substantial and pervasive deficits in processing speed and variable executive functioning including a notable weakness in mental set-shifting. These are consistent with problems reported by Mr. Glaud and evident across the records I reviewed, including prior neuropsychological evaluations.

125.    In his report, Dr. Rider further wrote that Glaud's "pattern of neuropsychological deficits, in conjunction with his frequent headaches, and continued visual difficulties are all consistent with deficits related to the longstanding impact of repeated head injuries."

**126.**    In his report, Dr. Rider further wrote,

Dr. Lehockey's evaluation appears to have raised some concerns about the validity of Mr. Glaud's complaints. However, according to the information she provided, behavioral observations substantiated his complaints of photosensitivity, slowed processing, difficulty concentrating, and the presence of anxiety and depression. Despite cooperative effort, Mr. Glaud's performance was deemed unreliable by Dr. Lehockey due to suboptimal results on the Green MSVT, a stand-alone measure of performance validity. This conclusion was reached despite previous evaluations by Drs. Cullum, Bruhns, and Libon, indicating cognitive deficits consistent with a post-concussive syndrome.

Dr. Lehockey's reliance on a single validity measure for this determination raises concerns about the thoroughness and accuracy of the assessment, particularly in light of the NFL's Baseline Assessment Program's (BAP) guidelines, which advocate for a comprehensive assessment approach employing multiple measures and sources to assess performance validity, as per the Slick criteria. This approach, focusing solely on the MSVT result, potentially overlooks the complexity of Mr. Glaud's symptoms and history, underestimating the impact of his repeated head injuries and current psychological state. The American Psychological Association's (APA) ethical code also emphasizes using multiple methods and sources for diagnosis and treatment, and Dr. Lehockey's methodology might not align with these standards, raising ethical concerns about the accuracy of

the assessment and its implications for Mr. Glaud's access to appropriate care and benefits.

127.    During the time that Dr. Rider's report was being prepared, the Disability Board compelled Glaud to attend a neurological evaluation with Barry McCasland, M.D., and a neuropsychological examination with Thomas G. Burns, Psy.D., ABPP.

128.    Both Dr. McCasland and Dr. Burns examined and evaluated Glaud in Atlanta, Georgia, requiring Glaud to travel from his home in New Jersey for the appointments.

129.    On January 30, 2024, Glaud was evaluated by Dr. McCasland. The appointment lasted approximately sixty minutes, and Dr. McCasland reports that he additionally reviewed 526 pages of Glaud's medical records, Dr. Streicher's prior neurological evaluation report, and Dr. Lehockey's prior neuropsychological examination report.

130.    In his February 1, 2024 report, Dr. McCasland opined that Glaud suffers from an intractable headache disorder.

**131.**    In his February 1, 2024, Dr. McCasland further wrote,

The player also underwent thorough neurocognitive testing by Plan neutral neuropsychologist Dr. Thomas Burns. The results of that evaluation were discussed in great detail. The player met criteria for validity, and therefore produced interpretable data. He was noted to have a deficiency in processing speed below the 1st percentile, a finding that was seen in prior testing. This cannot be explained by medications, since Emgality, the monoclonal anti-CGRP injection that he is taking, would not be expected to have such an effect, and he does not take any other medications. He was also found to have three of four memory tests below the 10th percentile. Although he is currently in therapy and suffers from depression, this was not felt to explain the memory findings. There are no substance abuse issues. **It is therefore our joint opinion that the player shows evidence of mild neurocognitive impairment.**

(emphasis in original).

132.     On January 31, 2024, Glaud underwent a neuropsychological evaluation performed by Dr. Thomas Burns. Dr. Burns reports that he additionally reviewed 526 pages of Glaud's medical records and 54 pages of "previous neutral reports."

133.     As part of Glaud's examination, Dr. Burns administered a series of standardized neurological tests to Glaud, including selected subtests of the Wechsler Adult Intelligence Scales, Fourth Edition (WAIS-IV); the Test of Pre-Morbid Functioning (TOPF); the Wisconsin Card Sorting Test (WCST); the Trail Making (TM), Verbal Fluency (VF) and Color-Word Interference (CWI) subtests of the Delis-Kaplan (D-KEFS): the Boston Naming Test (BNT); selected subtests of the Wechsler Memory Scale – IV (WMS-IV); the California Verbal Learning Test – II (CVLT-II),; the Rey Complex Figure Test (RCFT) – Copy; the Minnesota Multiphasic Personality Inventory – 2 / Restructured Form (MMPI-2RF); and the Beck Depression Inventory – II (BDI-II) and Beck Anxiety Inventory (BAI).

134.     As part of Glaud's examination, Dr. Burns also administered two stand-alone symptom validity tests: the Test of Memory Malingering (TOMM), which contains three subtests, and the Medical Symptom Validity Test (MSVT), which contains five subtests. Dr. Burns also  In addition to the TOMM and MSVT stand-alone symptom validity tests, Dr. Burns also administered Glaud embedded questions in the MMPI-2RF designed to test symptom validity.

135.    Following his examination of Glaud, Dr. Burns prepared and submitted a report to the Plan titled "NFL Player Benefit Program Neuropsychological Report." The report is dated February 3, 2024 and includes a Battery Report of Glaud's test scores.

136.    In his report, Dr. Burns reported that "Mr. Glaud was engaged and worked hard. He took frequent short breaks (usually about 1-3 minutes) between many subtests, remaining in his seat, resting, and closing his eyes and applying peppermint oil to his face and mouth . . . to ease his stomach that gets upset when he is nervous."

137.    In his report, Dr. Burns further reported,

> Mr. Glaud complained of light sensitivity, and consequently, overhead lights remained off and blinds remained closed throughout testing. He requested the brightness be turned down on the screen of the test iPad and it was reduced to his satisfaction for all of testing. Mr. Glaud also intermittently wore sunglasses & prism glasses and occasionally no eyewear. Mr. Glaud's thoughts were goal directed, linear and unaffected by any disordered thoughts. His mood and affect were also appropriate to the testing situation, although his affect was slightly restricted. Mr. Glaud was extremely slow and careful but persistent in his approach to all subtests. This led to an extended assessment time with all testing taking place between 9:00am and 4:30pm. Additionally, his slowness affected performance on all time-limited or speeded tests regardless of domain. Although Mr. Glaud was somewhat easily distracted, he used visual attention and other strategies to keep him on track, such as covering up parts of a page to reduce the competing visual array.

138.    Dr. Burns' Battery Report shows that Glaud scored "exceptionally low" on the WAIS-IV's composite Working Memory tests and WAIS-IV's composite Processing Speed tests.

139.    The Battery Report shows that Glaud scored "exceptionally low" on three aspects of the D-KEFS designed to evaluate processing speed/efficiency, and

"exceptionally low" on four other aspects of the D-KEFS on tests designed to evaluate executive function.

140.    The Battery Report shows that Glaud scored "below average" on the D-KEFS on a test designed to evaluate motor skill.

141.    The Battery Report shows that Glaud scored "below average" on four aspects of the CVLT-II, and "low average" on four other aspects of the CVLT-II on tests designed to evaluate verbal learning and recent memory.

142.    The Battery Report shows that Glaud scored "below average" on two aspects of the WMS-IV on tests designed to evaluate verbal learning and recent memory.

143.    The Battery Report shows that Glaud scored "exceptionally low" on the Rey-Osterrieth Figure Copy, a test designed to evaluate spatial-perceptual skills.

144.    The Battery Report shows that Glaud passed the TOMM test, a stand-alone validity test measure, with a "valid range" scores of 48 (Trial 1), 50 (Trial 2), and 49 (Retention).

145.    The Battery Report shows that Glaud passed the CVLT-II Forced Choice Recognition test, an embedded validity test measure, with a "valid range" score of 16/16.

146.    The Battery Report shows that Glaud passed the MSVT-IR and MSVT-DR, two stand-alone validity test measures, with "valid scores" of 100% and 95%.

147.    On the MSVT-CNS, a stand-alone validity test measure which he previously scored an "invalid score" of 85% during Dr. Lehockey's prior examination, Dr. Burns' Battery Report shows that Glaud scored a 95%, which is considered an "valid score."

148.     In his report to the Plan, Dr. Burns wrote that "[o]ver multiple evaluations (since 2016), Mr. Glaud had shown a decrease in overall performance over time" and that "[o]verall, current testing was quite consistent with previous neuropsychological testing in 2023."

149.     In his report to the Plan, Dr. Burns further wrote that Glaud's "[t]esting across four evaluations in 2016, 2018, 2023, and 2024 consistently indicate an impairment in processing speed [and his] processing speed deficit is likely complicated by daily headaches, sleep problems, and moderate depression contributing to his speed of task completion."

150.     In his report to the Plan, Dr. Burns opined that Glaud "meet[s] the necessary requirement of mild neurocognitive dysfunction, as his testing is consistent with an acquired deficit that reached the moderate degree of impairment since he shows an area of impairment."

151.     In regard to symptom validity, Dr. Burns reported to the Plan that Glaud's "[v]alidity testing showed performance that was considered valid on free standing measures of the MSVT and TOMM. Mr. Glaud's performance was solid with no evidence of exaggeration on many embedded validity measures as well (e.g., Recognition subtests of the WMS-IV for Visual Reproduction and Logical Memory)" and that Glaud's "CVLT-II Forced Choice Recognition was errorless (16/16 = 100%) further suggesting accuracy in the test scores."

152.    Dr. Burns further reported to the Plan that although test scores from the MMPI-II/RF suggested overreporting, it was his opinion that the results were "thought to be consistent with the identified elevation in depression."

153.    On February 1, 2024, Dr. McCasland and Dr. Burns completed and submitted to the Disability Board a form titled "Joint Physician Report Form Neurocognitive Disability Benefits", in which they jointly opined that Glaud shows evidence of acquired neurocognitive impairment.

154.    On March 8, 2024, Glaud, through his attorneys, submitted an appeal of the Plan's denial of his claim for NC benefits. Included with his appeal were new records from Dr. Susan Paradise, Doreen Bridgeman, MS, CCC-SLP, and Kathy Loder-Murphy, along with testimonial letters from Glaud and his spouse, Kassandra Glaud.

155.    In her witness statement letter, Kassandra Glaud detailed Glaud's day-to-day struggles with migraine headaches, extreme light sensitivity, short-term memory loss, noise sensitivity, and the impact of physical exercise on his vestibular symptoms, concluding that she "can only hope and pray that [Ka'Lial] lives long enough and has a quality of life that allows him to watch his young children grow into adults."

156.    Upon receipt of Glaud's completed appeal, the Disability Board conceded its decision-making authority to Groom Law Group.

157.    On April 17, 2024, Groom Law Group completed and emailed to the Disability Board an appeal summary and claim recommendation in a document titled "Ka'Lial Glaud NC Summary May 2024.DOCX".

158.    On May 15, 2024, the Disability Board held a quarterly meeting and discussed Glaud's claim appeal.

159.    On May 19, 2024, Plan Director Michael Miller wrote Glaud, reporting that at the May 15, 2024 meeting the Disability Board "decided to table your appeal for a record review by a Medical Advisory Physician ("MAP") neurologist and neuropsychologist, pursuant to Plan Section 9.3(a), for a final and binding determination as to whether you satisfy the Plan's requirement for NC benefits."

160.    Pursuant to its May 15, 2024 decision to refer the case to MAP physicians, the Disability Board referred Glaud's medical with neurologist Dr. Silvana Riggio and neuropsychologist Dr. William Garmoe for a final and binding determination on Glaud's eligibility for NC benefits.

161.     On June 8, 2024, Dr. Riggio and Dr. Garmoe completed and submitted to the Disability Board a report titled "NFL Player Supplemental Disability Plan Medical Advisory Opinion (Neuro-Psychology and Neurology) MAP Joint Review".

162.    In their joint report, Dr. Riggio and Dr. Garmoe wrote that it was "our conclusion that Mr. Glaud's neurocognitive scores are, overall, not valid and interpretable, and thus no clear conclusions can be drawn about the possible presence of acquired impairment" and that [w]e thus conclude that no determination can be made about whether he meets criteria for acquired neurocognitive impairment."

163.    In their joint report, Dr. Riggio and Dr. Garmoe further wrote,

It is possible Mr. Glaud has cognitive impairment, but this will require valid data in order to make a determination. Mr. Glaud's case and record of prior neurological and neuropsychological evaluations is complex. Mr. Glaud is clearly struggling with major psychological conditions, has had significant

disruptions in daily functioning over several years, and most reports describe him as seemingly sincere and also depressed and anxious. Our review is not suggesting that Mr. Glaud is malingering. Our strong recommendation is for Mr. Glaud to be seen for a thorough psychiatric and psychological assessment, as there may be significant psychological factors contributing to his difficulties functioning."

164.     In their joint report, Dr. Riggio and Dr. Garmoe do not discuss the validity or impact of Glaud's migraine headache disorder or intractable headache disorder.

165.     Neither Dr. Riggio nor Dr. Garmoe examined Glaud prior to forming their respective opinions or issuing their joint report.

166.     On June 11, 2024, the Plan provided Glaud a copy of the MAP Joint Review report and provided him until July 10, 2024 to respond.

167.     In response to the "strong recommendation" from Dr. Riggio and Dr. Garmoe in the MAP Joint Report that he "be seen for a thorough psychiatric and psychological assessment", Glaud underwent a psychological evaluation performed by independent psychological Marcia Baruch, Ph.D. on June 24, 2024.

168.     As part of Glaud's evaluation, Dr. Baruch administered a series of standardized psychiatric assessment tools, including the Wechsler Abbreviated Scale of Intelligence – Second Edition (WASI-II), the Posttraumatic Stress Disorder Checklist for DSM 5 (PCL-5), the Personality Assessment Inventory (PAI), the Beck Depression Inventory – Second Edition (BDI-II), and the Beck Anxiety Inventory (BAI). Dr. Baruch also conducted a clinical interview and administered a mental status examination.

169.     Following her examination of Glaud, Dr. Baruch prepared and submitted a report of her findings dated July 7, 2024.

170.     In her report, Dr. Baruch wrote that Glaud "was cooperative, polite, and appeared to put forth his best effort to respond to questions and complete tasks."

171.     In her report, Dr. Baruch wrote that "[Glaud's] presentation is consistent with his presentations during previous psychological and neuropsychological evaluations as well as during his treatment sessions."

172.     In her report, Dr. Baruch opined,

> When integrating the entirety of the data, which includes Mr. Glaud's history, record review, clinical interview, and psychological and personality inventories, it is apparent that Mr. Glaud has a neurocognitive disorder, from his TBI, along with symptoms of depression and trauma, secondary to the disorder. It is likely that his depression impacts his life, and in turn, impacts his neurocognitive testing, as it is known to do, and it is at times difficult to weed out what effects are from his neurocognitive deficits from his TBI and what are from his depression. That is why it is essential to review Mr. Glaud's history and evaluations in their entirety along with multiple validity tests done at different times during the evaluation. Also, since he has a diagnosed TBI, it has consistently been documented that he has been motivated to put forth his best effort, and there is no indication of malingering, then his neurocognitive evaluations accurately reflect his neurocognitive disorder resulting from his TBI.

173.     On July 10, 2024, Glaud, through his attorneys, provided a copy of Dr. Baruch's report to the Disability Board and requested its full consideration all of the medical testing and treatment evidence, all of which supported his claim for NC benefits.

### The Plan's Final Administrative Decision

174.     Upon receipt of Dr. Baruch's report and other new information, the Disability Board again conceded its decision-making authority to Groom Law Group.

175.     On July 26, 2024, attorney Natallia Maroz of Groom Law Group completed and emailed to the Disability Board an appeal summary and claim determination of

Glaud's eligibility for NC benefits in a document titled "Ka'lial Glaud NC Summary August 2024.DOCX".

176.    On August 21, 2024, the Disability Board held a quarterly meeting and "tentatively" determined that Glaud was ineligible for NC benefits.

177.    On September 4, 2024, the Disability Board voted to deny Glaud's claim for NC benefits.

178.    On September 5, 2024, the Plan issued a final claim denial letter to Glaud, reporting the Disability Board's determination that he was ineligible for NC benefits.

179.    In its September 5, 2024, letter, the Plan wrote,

> The Disability Board found that you are ineligible for NC benefits under Plan Section 6.1(f). This decision flows from Plan Section 9.3(a), which states that "the ultimate decision of the [MAP] is final and binding" on medical issues. The Disability Board is not free to disregard this collectively bargained Plan provision that was created to resolve situations such as this one, where conflicting evidence from the Plan's own Neutral Physicians exists. Thus, the Disability Board accepted MAP Dr. Riggio and MAP Dr. Garmoe's shared conclusion that, on the whole, the body of neuropsychological evidence and test data surrounding your application and appeal are not valid or interpretable, and this precludes any reliable conclusion as to whether you have an acquired neurocognitive impairment, as defined by the Plan.

180.    In its September 5, 2024, letter, the Plan further wrote that the Disability Board "reached its decision notwithstanding Mr. Frankel's arguments on appeal and any conflicting medical evidence in your file" because, "[a]s an initial matter, Plan Section 9.3(a) makes the MAP findings final and binding on the Disability Board."

<u>COUNT 1</u>
<u>ERISA 502(a)(1)(B) CLAIM FOR BENEFITS</u>
<u>AGAINST THE PLAN</u>

1-180.    Glaud repeats and re-alleges each and every allegation set forth in Paragraphs 1-180 as if fully set forth herein.

181.    This count is brought pursuant to ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)) against Defendant NFL Player Disability and Survivor Benefit Plan for payment of plan benefits.

182.    ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)) entitles Glaud to recover benefits due under the Plan and to enforce and clarify his rights to the benefits at issue.

183.    The medical evidence objectively establishes that Glaud satisfies all terms for receipt of NC Benefits under the Plan.

184.    The Plan's denial of Glaud's NC Benefit claim was and continues to be against the manifest weight of the medical evidence and contrary to the opinions of Glaud's treating opinions and multiple independent examining physicians, including the Plan's own retained neurologists and neuropsychologists.

185.    Glaud is and remains entitled to NC Benefits due, plus any interest that has accrued thereon; and he is also entitled to a declaration of rights that his NC benefits remain payable thereafter so long as he continues to meet the Plan's terms and conditions.

186.    Glaud has exhausted all avenues of administrative appeal available under the Plan, and this matter is ripe for adjudication.

WHEREFORE, Plaintiff prays for the following relief:

A.    That the court enter judgment in Plaintiff's favor and against the Defendant The NFL Player Disability and Survivor Benefit Plan and that the court order the

33

Defendant The NFL Player Disability and Survivor Benefit Plan to pay all accrued plan benefits to Plaintiff in an amount equal to the contractual amount of benefits to which he is entitled;

B.     That the Court order the Defendant The NFL Player Disability and Survivor Benefit Plan to pay Plaintiff compounding prejudgment interest on all contractual benefits that have accrued prior to the date of judgment in accordance with 29 U.S.C. § 1132(a)(1)(B) or 29 U.S.C. § 1132(a)(3);

C.     That the Court order the Defendant The NFL Player Disability and Survivor Benefit Plan to continue paying Plaintiff plan benefits in an amount equal to the contractual amount of benefits to which he is entitled for so long as he continues to meet the plan conditions for continuance of benefits;

D.     That the Court award Plaintiff his attorney's fees pursuant to 29 U.S.C. § 1132(g); and

**E.**     That Plaintiff be awarded any and all other contractual and/or equitable relief to which he may be entitled, as well as the costs of suit.

## COUNT II
## ERISA 502(a)(2) CLAIM AGAINST WILLIAM SIMON GARMOE, MA, Ph.D.
## FOR REMOVAL OF PLAN FIDUCIARY

1-186.   Glaud repeats and re-alleges each and every allegation set forth in Paragraphs 1-186 as if fully set forth herein.

187.     This count is brought pursuant to ERISA § 502(a)(2) (29 U.S.C. § 1132(a)(2) against Defendant William Simon Garmoe, MA, Ph.D. to remove him as a plan fiduciary.

188.    Dr. Garmoe currently serves as a Medical Advisory Physician to the Plan; and, in that role, he serves as a Plan fiduciary.

189.    As a Medical Advisory Physician, the Plan grants Dr. Garmoe the "full and absolute discretion, authority and power to decide . . . medical issues" related to claims for NC Benefits.

190.    Dr. Garmoe is also one of the authors of the "Neurology/Neuropsychology Neutral Physician Panel Orientation Manuel", a set of rules, guidelines, and required reporting forms provided to the "panel" of physicians authorized by the Benefits Office to perform neurological and neuropsychological medical examinations under the Plan.

191.    Dr. Garmoe has received over $1.1 million in direct compensation from the Plan for plan years 2017 through 2023, including $250,000 in 2022 and $192,500 in 2023.

192.    A plan fiduciary shall "discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries* . . . for the exclusive purpose of providing benefits to participants . . .  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . . by diversifying the investments of the plan so as to minimize the risk of large losses . . ." 29 U.S.C. § 1104(a)(1)((A)-(C) (emphasis added).

193.    The duties and powers of an ERISA plan fiduciary "reflect Congress' policy of 'assuring the equitable character' of the plans," *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570 (1985), and they are held accountable to the plans for their breaches. *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1298 (3rd Cir. 1993).

194.     Dr. Garmoe owed a fiduciary duty to Glaud and all NFL players covered by the Plan to act solely in their best interest and for the exclusive purpose of providing benefits to Plan participants and their beneficiaries and defraying reasonable expenses of plan administration.

195.     Dr. Garmoe has breached the fiduciary duties owed to Glaud and all NFL players covered by the Plan by regularly and systematically ignoring key evidence of disability, by creating systems and administering the Plan in a manner that allows the Plan to avoid paying meritorious benefit claims, and by otherwise routinely failing to act in the best interest of Plan participants.

196.     Dr. Garmoe has a pattern and practice of repeated and substantial violations of fiduciary duties. Other Plan participants have alleged that that Dr. Garmoe, along with the other highest-paid "neutral" Plan physicians, found zero out of over 100 players to qualify for benefits in periods from 2017 through 2021 and that Dr. Garmoe has routinely dismissed unanimous findings and objective evidence of neurocognitive impairment.[4]

197.     Other Medical Advisory Physicians have alleged that the Plan expects their compliance in securing claim denials. For example, Dr. Alfred J. Tria, who previously worked for the Plan as a Medical Advisory Physician, has stated that he was chastised by Plan representatives for qualifying a particular player for benefits.[5]

---

[4] Compl. ¶¶ 92-94; 96, *Alford, et al. v. The NFL Player Disability & Survivor Benefit Plan, et al.*, No. 1:23-cv-00358-JRR ("Dr. Garmoe dismissed unanimous findings and, instead, contended in the MAP report that Plaintiff Zeno's objective impairment "might relate to other factors, and does not appear indicative of neurocognitive impairment." He did not explain in his MAP report what those 'other factors' might be.").
[5] Compl. ¶ 37, *Cloud v. The Bert Bell/Pete Rozelle NFL Player Retirement Plan*, No. 3:20-cv-01277-S (N.D. Tex., Jan. 11, 2022)

**198.**     Dr. Garmoe's breaches of fiduciary duty have directly resulted in economic harm to Glaud and other Plan participants by systematically denying qualified claims for plan benefits.

199.     Dr. Garmoe's breaches of fiduciary duty have also directly resulted in economic harm to the Plan, as the Plan has incurred and continues to incur excess costs related to his breaches.

200.     At 29 U.S.C. § 1132(a)(2), ERISA allows for the removal of a plan fiduciary who has repeatedly and substantially breached their fiduciary duties and caused harm to the Plan and its participants. This remedy is unavailable under ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)).

201.     Removing Dr. Garmoe from serving as a plan fiduciary would provide a benefit to all plan participants, including Glaud, because Dr. Garmoe has continually acted in an objectively unreasonable manner that conflicted with his duties of loyalty and care and will continue to do so in the future.

202.     Removing Dr. Garmoe from serving as a plan fiduciary would also provide an economic benefit to the Plan.

**203.**     Furthermore, if Dr. Garmoe remains in his role as a Medical Advisory Physician, Glaud faces a direct threat of future harm because the Plan will continue to administer his claim for NC benefits, making him subject to Dr. Garmoe's ongoing discretionary authority to determine medical issues related to his impairments and the framework he has established for all physicians to evaluate neurological and neuropsychological impairments.

WHEREFORE, Plaintiff prays for the following relief:

A.    That the court enter judgment in Plaintiff's favor and against the Defendant William Simon Garmoe, MA, Ph.D, and that the court issue an order removing Defendant William Simon Garmoe, MA, Ph.D from serving as a fiduciary to The NFL Player Disability and Survivor Benefit Plan;

B.    That the Court award Plaintiff his attorney's fees pursuant to 29 U.S.C. § 1132(g); and

C.    That Plaintiff be awarded any and all other contractual and/or equitable relief to which he may be entitled, as well as the costs of suit.

## COUNT III
## ERISA 502(a)(3) CLAIM AGAINST SILVANA RIGGIO, M.D.

1-203.    Glaud repeats and re-alleges each and every allegation set forth in Paragraphs 1-203 as if fully set forth herein.

204.    This count is brought pursuant to ERISA § 502(a)(2) (29 U.S.C. § 1132(a)(2) against Defendant Silvana Riggio, M.D. to remove her as a plan fiduciary.

205.    Dr. Riggio currently serves as a Medical Advisory Physician to the Plan; and, in that role, she serves as a Plan fiduciary.

206.    As a Medical Advisory Physician, the Plan grants Dr. Riggio the "full and absolute discretion, authority and power to decide . . . medical issues."

207.    Dr. Riggio is also one of the authors of the "Neurology/Neuropsychology Neutral Physician Panel Orientation Manuel", a set of rules, guidelines, and required

reporting forms provided to the "panel" of physicians authorized by the Benefits Office to perform neurological and neuropsychological medical examinations under the Plan.

208.    Dr. Riggio has received over $1.25 million in direct compensation from the Plan for plan years 2017 through 2023, including $260,500 in 2022 and $198,000 in 2023.

209.    A plan fiduciary shall "discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries* . . . for the exclusive purpose of providing benefits to participants . . .  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . . by diversifying the investments of the plan so as to minimize the risk of large losses . . ." 29 U.S.C. § 1104(a)(1)((A)-(C) (emphasis added).

210.    The duties and powers of an ERISA plan fiduciary "reflect Congress' policy of 'assuring the equitable character' of the plans," *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570 (1985), and they are held accountable to the plans for their breaches. *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1298 (3rd Cir. 1993).

211.    Dr. Riggio owed a fiduciary duty to Glaud and all NFL players covered by the Plan to act solely in their best interest and for the exclusive purpose of providing benefits to Plan participants and their beneficiaries and defraying reasonable expenses of plan administration.

212.    Dr. Riggio has breached the fiduciary duties owed to Glaud and all NFL players covered by the Plan by regularly and systematically ignoring key evidence of disability, by creating systems and administering the Plan in a manner that allows the

Plan to avoid paying meritorious benefit claims, and by otherwise routinely failing to act in the best interest of Plan participants.

213.    Dr. Riggio's breaches of fiduciary duty have directly resulted in economic harm to Glaud and other Plan participants by systematically denying qualified claims for plan benefits.

214.    Dr. Riggio's breaches of fiduciary duty have also directly resulted in economic harm to the Plan, as the Plan has incurred and continues to incur excess costs related to her breaches.

215.    At 29 U.S.C. § 1132(a)(2), ERISA allows for the removal of a plan fiduciary who has repeatedly and substantially breached their fiduciary duties and caused harm to the Plan and its participants. This remedy is unavailable under ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)).

216.    Removing Dr. Riggio from serving as a plan fiduciary would provide a benefit to all plan participants, including Glaud, because Dr. Riggio has continually acted in an objectively unreasonable manner that conflicted with her duties of loyalty and care and will continue to do so in the future.

217.    Removing Dr. Riggio from serving as a plan fiduciary would also provide an economic benefit to the Plan.

**218.**    Furthermore, if Dr. Riggio remains in her role as a Medical Advisory Physician, Glaud faces a direct threat of future harm because the Plan will continue to administer his claim for NC benefits, making him subject to Dr. Riggio's ongoing discretionary authority to determine medical issues related to his impairments and the

framework she has established for all physicians to evaluate neurological and

neuropsychological impairments.

WHEREFORE, Plaintiff prays for the following relief:

A.     That the court enter judgment in Plaintiff's favor and against the Defendant

Silvana Riggio, M.D. and that the court issue an order removing Defendant Silvana

Riggio, M.D. from serving as a fiduciary to The NFL Player Disability and Survivor Benefit

Plan;

B.     That the Court award Plaintiff his attorney's fees pursuant to 29 U.S.C. §

1132(g); and

C.     That Plaintiff be awarded any and all other contractual and/or equitable

relief to which he may be entitled, as well as the costs of suit.


**[SIGNATURES ON FOLLOWING PAGE]**


Dated: September 4, 2025                    Respectfully Submitted,

                                            */s/ Richard Frankel*
                                            *One of Plaintiff's Attorneys*

                                            William T. Reynolds, IV (*seeking admission
                                            phv*)
                                            **THE LAW OFFICES OF CHICAGO-KENT
                                            COLLEGE OF LAW**
                                            565 West Adams Street, Suite 600
                                            Chicago, IL 60661
                                            Telephone (312) 906-5038
                                            Facsimile (773) 696-2314
                                            wreynold@illinoistech.edu

                                            Richard L. Frankel

**BROSS & FRANKEL, P.A.**
725 Kenilworth Ave, Suite 2
Cherry Hill, NJ 08002
Telephone (856) 795-8880
Facsimile (856) 234-4848
*Attorneys for Plaintiff*